Our first case for today is, or in our only case for today, is 2024-20451 United States of America v. James Baldemoro. We'll hear from Mr. House. Thank you, Chief Judge Elrod, and may it please the Court. Your Honors, as you know, we've asked the Court to vacate Mr. Baldemoro's revocation judgments in this case. It may seem like there's a fair bit of complexity to the alternative statutory and constitutional grounds we've offered in favor of that result, I do admit, but as always, my job here is to simplify, and the best way I think I can do that is by pointing out what all three of our arguments come down to is a simple, common-sense observation, and that is that 11 is more than 10. Mr. Baldemoro's statute of conviction made his offense punishable by no more than 10 years, but by operation of Section 3583E3, the prison term he's received for that offense as part of the penalty for that offense has been adjusted to 11 years. That is precisely the scenario that all five justices that were necessary to the Hayman judgment flagged as the rare and likely only situation in which E3 would work a heartland violation of the Fifth and Sixth Amendments prohibition on allowing facts that aren't reflected in the defendant's plea as here or in a jury's verdict to trigger more punishment than that defendant could have otherwise received, and that's exactly what we have. Now, obviously, that logic is not binding on this court, but we find it persuasive, and we think this court should too, but first of all, our first-order position is a statutory argument that would avoid that constitutional question, and so I'll start there. The basic premise of that argument is that what courts have often overlooked when they're looking at the effect of E3 in a situation like this is how do we construe the statute, and so what I did was I looked at the statute in the text, and I thought to myself, well, why is everyone overlooking Johnson, and that's where our position flows from. Johnson, as reaffirmed in Hayman and most importantly as recognized by this court's recent decision in Lipscomb, that decision recognized that under Johnson, revocation is part of the penalty for the underlying offense, and what Lipscomb recognized is that what that means in this context is that what a court is doing when it's revoking a sentence is it's adjusting that original sentence, and so the logical end point of that is that once the adjustment butts up against the statutory maximum described in the underlying statute of conviction, you have a problem, and in our view, a direct conflict between E3 and the statute of conviction here, 2252A. Can we talk about this a little bit though? Sure. Don't we have two cases at least that hold that even if the defendant would serve a term of imprisonment beyond the statutory maximum that under 3583E3, that's okay? Don't we have Hampton and Henson that have both said that? No. In both Henson and Hampton, the court wasn't presented with that scenario. It was not presented with a defendant who original sentence plus revocation sentence went above the statutory maximum. They could permit re-imprisonment even if it would. You believe that those cases do not stand for that proposition? No. What Henson stands for is one, that the fact that a revocation sentencing range, which is always just advisory because those after all are policy statements, isn't affected by the rule of Booker, and then the court did go on and say that there's no Sixth Amendment problem with the simple fact of relying on judge found facts to revoke under E3, but again, that's consistent with our position that in the 99% of cases where E3 doesn't operate to come up against the statutory maximum, there is no problem. So this is not a quote that says, can be punished for the underlying offense with revocation imprisonment if he violates the conditions of supervised release even if the total amount of time that the defendant thereby spends in prison exceeds the statutory maximum for the underlying offense? I believe that's a quote from a footnote or it's simply just a quote recognizing that the court has recognized that in other situations. And I think that what our position is is that in that situation, one, it wasn't presented to the court. Nobody pressed the argument there. And two, that what the court was doing was making a factual observation that it has always been the case that you can read E3 in this way. And we respect that. We agree that E3 can be read or is read as naturally read does allow for a sentence to be above the statutory maximum. Well, the way to harmonize that is to say that Congress devised two separate parallel frameworks. One, the maximum sentence allowed for the underlying conviction. Two, the maximum ranges parameters for the event of a revocation of supervised release. I mean, they're harmonious in that regard. I understand that point, Judge Wilson. And we did discuss, I went through that in the opening brief. But that seems consistent with our case law as well as what the Supreme Court has and has not held in binding precedent. I don't agree that it's consistent with what the Supreme Court has and has not held because what that, the assumption there is that what, first of all, I do absolutely agree that supervised release, that component is a separate component of the overall sentencing package. But then so is revocation of supervised release. And that's what Johnson says is not a correct assumption. Johnson makes Well, it arises from the underlying conduct of conviction, et cetera. That's what Johnson says. That's what But they didn't extend that in Haymond. Well, they didn't speak to the situation in Haymond, right? Well, they tried, but they only got four justices to do so. I agree that I mean, they raised the exact same 1%, this is a rare case, and da, da, da, da. But that was plurality. And Justice Breyer didn't bite onto that, nor did the dissent. That's true. But Justice Breyer also completely and utterly agreed with that proposition, which was just a dicta in the plurality. As to subsection K. No, no, no, no. In the oral argument, and I've cited the pages of the transcript. Not in the opinion. I agree. I agree. And like I said, we're not saying that Justice Breyer's comments at oral argument are binding. We're simply saying they're persuasive in the fact that it was obvious to him, and he expressed it to both advocates repeatedly, as did Justice Kagan, that what he was trying to do was convince everybody that the problem wasn't even present in subsection K, but that the only place where we would have an apprendee issue is if you added the initial sentence plus the revocation sentence, and that pushed you beyond the statutory maximum. And nothing he said in his separate concurrence is inconsistent with that. What the plurality said was we are limiting our holding to subsection K. That's the same thing Justice Breyer said. And that is, so that's why the issue is completely open as to what the effect is in this rare circumstance where you do have the initial and the later sentence coming together. But you said it's completely open. I mean, you're talking about the Supreme Court. But isn't it true that every circuit to have considered the statutory question has rejected the argument that you made about the understanding of the statute? I'm not aware of anybody raising the statutory argument in the terms that I have. I am aware of the government cited Williams in its second reply brief, right, the 1990 case from this court that happened, you know, 10 years before Johnson, 10 years before Apprendi, and that relied on the idea that revocation is punishing the violation conduct as opposed to the underlying conviction, which Johnson made clear is not correct. So there are those decisions out there, but we think we've explained in the briefing why we don't think that those control, especially because the issue I presented wasn't pressed or passed. There have been multiple circuits who, post-Hayman, have reflexively rejected claims like mine, but actually mostly in the context of 3583G, the mandatory provision requiring revo for a drug violation. Those cases have reflexively said Justice Breyer's opinion is controlling. And I think what I've tried to do in the briefing is show that that is an incorrect assumption. It is absolutely the controlling opinion as to what is the effect of a mandatory revocation, whether or not that adds, you know, raises an Alain problem, and whether or not the fact that revocation is mandatory also raises a consideration that this is new punishment for the violation conduct as opposed to the original conduct. What we're saying is that the Court didn't decide the issue that it spoke to in dicta and, in fact, suggested that we have the right view of the argument on it, at least as to the Sixth Amendment. And, again, just as I noted in the recent 28J response slash letter, Justice Gorsuch recently wrote separately, again, not binding, but persuasive, to make clear that this issue is open. And he, in fact, urged the lower federal courts to give careful consideration to this issue. He certainly wouldn't have, it wouldn't have made sense for him to say that if he felt that Justice Breyer's concurrence resolved the matter and that because the lower courts couldn't speak to the issue and give it reasoned consideration if they were controlled by what Justice Breyer said. And so that's why we think that that argument is absolutely still open. And if you, if the Court isn't willing to go with the statutory argument that this is what the result of what's going on here is that we just have a sentence that's in excess of the statutory maximum, then you have to look at, well, what is E3's effect in this situation? Judge Wilson, you proposed the idea that what E3 is doing is creating a separate maximum for a separate term of imprisonment that is like a parallel track of imprisonment that would, I suppose, in that view, be authorized by the guilty plea in the verdict. But the problem with that is it's just contrary to what, to all of the apprendee precedent and progeny and the understanding of what a statutory maximum is in every single one of those cases. The Court referred to, if we're talking about a statute, it's talking about the statutory maximum. There was no suggestion in Apprendi that the Court had to worry about the length of time that Mr. Apprendi could have been placed on post-release supervision based on the enhancements that he was receiving there. It was a five-year maximum and then a finding of racial bias raised that maximum to seven. Nobody suggested that the five and the seven depended on how much extra time you could get on supervised release. And there's also just no indication that what Congress did whenever it was enacting subsection E3 was to drastically change the conception of statutory maxima to not simply the maximum that's identified in the offensive conviction, but also that maximum plus the amount a person could get on supervised release. Yeah, but this isn't an obscure possibility. It might be rare. But one thing that's not anywhere in the statute is Congress's preference, statement, decision, certainly statutory language that says, oh, and when the defendant has prior served his maximum incarceration, you can't imprison them on supervised release. That's just nowhere in the statute. I agree. And so, like the government argues, the very defendants who may need a prison term after revocation the most can flaunt it and there's not anything that the courts can do. Well, and I— I mean, that is an illogical outcome. I would push back on that, as I have in the second reply brief, to note that, one, our position doesn't even ever come up when it comes to a Class A felony. Class A felonies are the most serious offenses that people can commit. They are all subject to a life term of imprisonment. So no amount of successive revocations could ever get you up to the maximum, right? You could never exceed the maximum of life or death from going—from being revoked. And so the only time our—our situation here could ever even come into being is in the rare circumstance where an individual has, one, a—a lower class offense, and, two, it will almost always be taken care of by the fact that you reduce the amount of supervised release that can be tacked onto a revocation sentence by the amount of imprisonment. So usually you're going to exhaust the amount of supervised release a person can still be on before you get anywhere near the statutory maximum. And I did also want to note that it won't ever really apply in a situation where a person has more than one count, two counts, for instance. If an individual is sentenced to the statutory maximum on one count, but a mid-range or low-range, whatever, sentence on the second count, then those supervised release terms are going to be concurrent. And if there's a revocation, the—the—yes, you wouldn't be able to add time onto the first revocation—or the first supervised release, but you would be able to—to add revocation time onto the second count. If there's no further questions, I'll come back for rebuttal. Thank you. You've saved time for rebuttal. Mr. Wade? May it please the Court, Jack Wade on behalf of the United States. The issues in this case are foreclosed. The statutory issue by this Court's decision in Williams, the logic of which was reiterated in Hampton and Hinson, and the constitutional argument by this Court's decision in Hinson. But even if those cases are distinguishable, this Court should still affirm. Starting with the statutory argument, revocation sentences draw on the statutory maximum term of supervised release, not the statutory maximum term of imprisonment. And that's clear from both the text of 3583 and from the clear congressional purpose behind supervised release. Starting with the text, there are only two limits mentioned in Section 3583e3, those being the statutory maximum term of supervised release and also a lower—generally lower—per revocation limit. Conspicuously not mentioned is the statutory maximum term of imprisonment. And in a very detailed statute like this one that's very exhaustive as to all of the workings of supervised release, the natural inference here is that from that silence, it just means that only the statutory maximum term of supervised release applies and not the statutory maximum term of imprisonment. That's additionally clear from the congressional purpose behind supervised release, which is, of course, to rehabilitate defendants. Defendants, you know, sentenced at or near the statutory maximum are those who need it most. And my friend's interpretation, if he's correct, supervised release would be entirely truthless for those defendants. I would like to briefly touch on what my friend mentioned in his reply. Well, you do have to concede there is a quirky oddity here. You've got Johnson that says, well, the punishment for revocation or in revocation of supervised release relates back to the original conduct and the original conviction. So it's not the new conduct. And regardless of whether that new conduct is assessed under a preponderance or beyond a reasonable doubt, it's not a criminal proceeding. I mean, we've got law that says that also. But you are enhancing or increasing the incarceration beyond the statutory maximum that was for that underlying conduct. I mean, how do you square that circle? So is this, sorry, just to be clear, is this on the constitutional question or on the statute? Well, I guess either. I'm just trying to square Johnson with the sort of framework that we're talking about, that these are parallel statutes. They are different sets of proceedings, different aims, those kinds of things. But you still have the statutory maximum and you've got the Supreme Court saying that a revocation sentence is related back to the initial conduct and conviction. So I'll answer that in two parts. First, the cases that my friend relied on, there are three of them for this proposition that you're adjusting the initial sentence, Hammond, Johnson and Lipscomb. All three of them recognize that different parameters govern revocation sentences. It's not exactly the same as the initial sentencing. They specifically noted these specific parameters in 3583E3 without mentioning at all the statutory maximum term of imprisonment. So they don't seem to resolve the question in that regard. And also just the underlying logic being that, you know, you can be adjusting the initial sentence without adjusting all of it, right? You can be adjusting just the term of supervised release without adjusting the term of imprisonment. And, you know, that's actually something that this Court mentioned in Lipscomb specifically. When it's talking about this, it says that what you're doing when you are revoking supervised release is that you are altering the terms of supervised release. It doesn't say that you're altering the term of imprisonment. In fact, that primary term of imprisonment, that part of the sentence, is final. It can't be adjusted after sentencing. And then as far as the constitutional question is concerned, I disagree that this, you know, somehow enhanced the available penalties. So properly understood, the conviction authorizes two parts of the sentence. You have the primary term of imprisonment, which is subject to its own statutory maximum that's specified in the offensive conviction. And then you have the term of supervised release, which is a term of conditional liberty that is governed by the statutory maximum term of supervised release. And implicit in the concept of conditional liberty is that it can be revoked if violated, right? So it's part and parcel of the sentence and what is authorized by the conviction that can be revoked without a new criminal proceeding or new criminal prosecution. Further on the constitutional question, you know, we would also point out that the Supreme Court in Morrissey and also this court in Hinson recognized that there is a sort of temporal aspect to the Sixth Amendment question, consistent with the text of the Sixth Amendment, which focuses on whether the particular proceeding is part of a ongoing or new criminal prosecution. And specifically, those cases mark the end of the original criminal prosecution at sentencing, right? So once sentencing is done, any further proceedings are not going to be part of the criminal prosecution. And so the trial rights that my friend invokes do not attach to those  Why wouldn't they then attach to a new one, to the new proceeding, if they're treated separately? Right. So to clarify, are you asking if this is a new prosecution? Well, you just said it's not the old one. Yeah. And then so it's under your interesting argument that you're just now making, if it was a new one, why wouldn't those new ones trigger the rights? So, well, it is neither part of the original prosecution nor a new prosecution, right? So it doesn't... Is there some kind of purgatory in prosecutions? I mean, I'm just trying to figure out what you mean. Right. So what it is, like with parole, it's neither part of the original prosecution nor a new prosecution. It is a post-sentence administration proceeding, right? So we have somebody who's still serving their sentence, and they have violated the terms of their supervised release or parole in the old system, right? And so it is revoked without regards to those trial rights that are not implicated at that proceeding. You know, Justice Gorsuch encouraged us recently in his dissent from the denial of certiorari in the Burnett case, very recent case, that we need to, as a lower court, be more careful in considering the Sixth Amendment's application in the context, which is the same context because the Burnett context appears to be exactly like Valderrama's context. Do you disagree that it's exactly the same context? No, I agree. How would we be more careful in considering the Sixth Amendment's application as we've been urged to do by Justice Gorsuch? Well, I would initially note that Justice Gorsuch spoke only for himself. Yes, I think I said that at the beginning, that it was a dissent from the denial of certiorari, but he told us to do this. And so after we've noted that, how would one go about doing that? Well, I think you would go about doing it by following the arguments that I've laid out in my brief, which is, first, you ask this question whether it's part of an ongoing criminal prosecution. And if you wanted to avoid that question, one way the court could go about doing it would be to say, look, as many courts have said, actually, the statutory maximum term is supervisory. So when you revoke that, because this is a term of conditional liberty, you're not actually increasing the statutory maximum, you're just enforcing it. You're enforcing the sentence that's already been imposed. So it doesn't increase anything. And then additionally, one more thing that I would note on this constitutional question is just the appending line of cases fundamentally is concerned with things that are known at sentencing or at the time of trial, and Congress or states trying to push those things past the trial stage and make it so that the judge can determine those things. That's the chief mischief with which apprendi is concerned. And that's not something that's happening here. Of course, all of the violation conduct necessarily in revocation proceedings happens after sentencing. So this is not something that could have originally been indicted or dealt with at a trial. You would need a whole new proceeding. And at that point, we're very far from the heartland of the apprendi line of cases. Do you have anything further? Unless the court has further questions. Seeing none, hearing none, thank you for your argument. Yes, thank you. We would ask that the court affirm the second appeal and dismiss the first appeal as moot. Before you leave, you say we should dismiss it as moot. So you raise something new. Sorry to keep you. Yes, sorry. Isn't there enough, though, were we to find in Mr. Baltimore's favor on the second appeal, there would be enough of an interest or a stake in the first appeal for him to have standing? In other words, for there to be a live issue there. Is it truly moot is the question. Yes. I mean, we think it's moot. I understand there's not a whole lot of case law on this question. I would direct the court to the decision in Wynn in the Eighth Circuit, which found that in the appeal from a second revocation, the appeal from the first revocation was moot. The exact same issues were addressed in both cases. It didn't seem to be troubled by this idea. And again, I think that that has a certain logic to it. What if it's not moot? If it's not moot, then the court should just affirm in both appeals. Well, you agree they would rise or fall together. Yes. I mean, in other words, if the issues in the second appeal have merit, then the issues in the first appeal also would have merit. Yes. Is there any sort of reason that would defeat mootness for the district court to need to reach the first revocation sentence, or could the district court just consider everything? I mean, the district court mentioned, well, if it goes up to the Fifth Circuit and they tell me I'm wrong, I'll fix it. So practically speaking, I guess the district court's cognizant of this either way. But it still kind of sounds like the first appeal wouldn't be mooted. Yes. So we disagree. But again, I think this is largely an academic issue in the context of this case because, as Your Honor mentioned, both appeals involve the same issues. I think one thing that the court could do if it doesn't want to address the mootness question, one thing it could do would be to affirm in the second case, or vacate if you find for my friend in the second appeal, and then equitably dismiss the first appeal as moot. And as Your Honor mentioned, I think the district court will get the message at that point. You don't actually have to act on the first revocation judgment formally in order for the underlying logic of Johnson v. Pettiford to convince the court to terminate supervised release potentially early. Why is this important to the government? Why is that so much better than arguably just foreshadowing, not foreshadowing, to affirm? Why are you fighting this? What's going on here? Well, Your Honor, as officers of the court, we want to make sure that the court does not overstep its jurisdiction. But again, it really doesn't matter to us, particularly in this case. It's just about the underlying jurisdiction of this court, and we're trying to do our job in forming this court. Do you have anything further? No, Your Honor. Thank you. I think we're done. We have your argument. I hope to make four points on rebuttal, Your Honors, if I can. The first one, my friend Mr. Wade says that this isn't this far away from the heartland of Apprendi, but this is exactly inside the heart of Apprendi. And I think that what the government is overlooking whenever it argues the contrary is that Apprendi and the cases that follow from it emphasize that what matters in that context is not form but effect. Right? And so I hate to do this, but the court's words are better than mine always. And so what Apprendi itself said, that the relevant inquiries are not one of form but of effect. The question is, does the requisite judicial finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict? This is a situation where Mr. Baltimore, receiving 10.5 years and then 11 years, absolutely depended on a fact that he did not have to admit when he pled guilty, and that was not required to be submitted to his jury. Or to the jury he would have had had he insisted on a jury trial. And I will also go to Blakely. The statutory maximum for Apprendi purposes is the maximum sentence a judge may impose solely on the basis of the facts reflected in the jury verdict or admitted by the defendant. So again, solely on the basis of the facts Mr. Baltimore admitted, he could not have gotten 10.5 years and he could not have gotten 11 years. The fact that's coming in is the violation conduct. And in almost all of E3's operation, that is not a problem, and we are in fact just sanctioning the breach of trust and adding more to the initial offense within the statutory range, but what the problem is here is that we've gone beyond that range. And I would like to note that that is a revolutionary shift from the predecessor system that we had in parole. The thing about the government's view here is that the logical extension is that an individual can be sentenced by more time than the statutory maximum. That was unknown to the law in the system of parole. No defendant could ever, upon revocation, be sentenced to more time than their original sentence, let alone the statutory maximum. And if the defendant was put on probation, they could be revoked, but they could never in any instance receive more than the statutory maximum punishment upon revocation. And so I would hesitate if I were this court to assume that what Congress was doing was making this revolutionary change to a system where Mr. Baltimore's offense is punishable by just 10 years in 1986, and then in 1987 it's punishable by 10 years, and then actually up to life because that's the maximum of supervised release. And of course this case only underscores the primary problem that Justice Gorsuch has emphasized not only in the Burnett separate opinion but in his plurality decision, signed on by three other justices as well, that the logical consequence also leads to exactly what could happen to Mr. Baltimore, and that is a perpetual cycle of two-year imprisonment terms for non-criminal conduct or criminal conduct not proved beyond a reasonable doubt ad infinitum. I don't think that that's... Yeah, but he said he intended to violate his terms. I mean, I'm not sure what the standard of proof really gets you in this case because he absolutely concedes he deliberately was violating the terms. The second go, he wanted to go back to prison, I thought is what he said. Judge Wilson, that's true, but you have to take that in context, the fact that he was homeless and was stage 5 renal cancer and wasn't... But regardless of that, he admitted to violating the terms of supervised release and said he wasn't going to comply. What he admitted to was that he had told the treatment therapist that he didn't want to keep going to therapy because he couldn't afford to get there and that he was having difficulty doing that and didn't have a place to live. And so the therapist concluded from that that he was recalcitrant and never going to come back. And yes, he said some regrettable things, but that's something that he... Well, he did it twice. Sure. He had four grounds for revocation the first go, and basically it was pretty clear. I mean, there's nothing to prove beyond a reasonable doubt. You'd have us go through a jury indictment and a trial in front of a jury, not a jury indictment, but an indictment and a trial in front of a jury to basically prove what he has proved himself, that he deliberately did. Doesn't that, practically speaking, undermine your argument? I don't think so. Look, Judge Wilson, I don't mean to be snide by this, but that was a very compelling jury argument, but it's one that would have to be made by a prosecutor and by a different standard, and it would be placed up against Mr. Baldemaro's rather sympathetic explanation against the idea that these violations were actually willful as opposed to almost coerced or under duress of being homeless and having a serious kidney disease. And so it's for these reasons we do think that this is a serious problem that the court should take seriously and hopefully reverse Mr. Baldemaro's revocation judgments. Thank you for the time. Thank you, Mr. House. We appreciate your argument, and Mr. Wade also. We take the case under submission, and this concludes this sitting of the court.